**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MICHAEL MOORE, | : | |
| | : | |
|     Plaintiff, | : | |
| | : | Civil Action No.:    25-2150 (RC) |
|     v. | : | |
| | : | Re Document No.:    10 |
| DISTRICT OF COLUMBIA, *et al.*, | : | |
| | : | |
|     Defendants. | : | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING DEFENDANT DISTRICT OF COLUMBIA'S PARTIAL MOTION TO DISMISS**

## I.  INTRODUCTION

In August 2024, Plaintiff Michael Moore was stabbed by a fellow detainee in the District of Columbia Department of Corrections Central Detention Facility ("CDF" or "D.C. Jail").  In June 2025, Moore filed this civil action against the District of Columbia and "Unknown Correctional Officers" in Superior Court for the District of Columbia seeking compensatory damages for injuries he suffered from the attack.  His Complaint brings one count for an alleged Fifth Amendment due process violation under 42 U.S.C. § 1983, and two counts of negligence under D.C. common law.  The District removed this case to federal court and has moved to dismiss Moore's constitutional claim.  For the reasons stated below, the Court grants the District's partial motion to dismiss.

## II.  BACKGROUND

On August 30, 2024, Moore was a pretrial detainee in the D.C. Jail.  Compl. ¶¶ 1, 5, ECF No. 1-2.  That day, he was "about to enter the CDF Housing Unit Southeast 3 downstairs shower when another detainee began talking to" him.  *Id.* ¶ 8.  "The other detainee then stabbed Mr.

Moore in the chest, head, back, side, and shoulder" with a metal knife. *Id.* ¶¶ 9, 57. Despite Department of Corrections ("DOC") policy requiring officers to monitor every housing unit, no officer was in the housing unit during the attack. *Id.* ¶¶ 10–11. "After being stabbed, Mr. Moore ran to look for staff so that he could obtain medical treatment, and finally found four officers standing around the area of the unit called the bubble." *Id.* ¶ 12. Moore was taken to the George Washington University Hospital, where he received extensive treatment for his severe injuries, including two open heart surgeries. *Id.* ¶ 13. He still suffers from his injuries today. *See id.* ¶ 14.

On June 5, 2025, Moore filed his Complaint seeking compensatory damages from the District of Columbia and "Defendants John Does" who "are presently unknown correctional officers employed by the D.C. Department of Corrections." *Id.* at 1–2, 14. His Complaint brings one count for a Fifth Amendment due process violation under 42 U.S.C. § 1983, asserting that "jail officials must take reasonable measures to guarantee the safety of the residents." *Id.* ¶¶ 53–58. He also brings two counts of negligence based on inadequate contraband control and supervision. *Id.* ¶¶ 59–70.

The Complaint describes the D.C. Jail as "pervasively understaffed," with "not enough officers to provide effective supervision and to carry out their duty to ensure the safety of all detainees." *Id.* ¶¶ 15–20. The Complaint then recounts the findings of a 2021 United States Marshals Service report that described safety concerns in the D.C. Jail, including "understaffing and overcrowding," inconsistent entrance screening procedures that created a higher risk of contraband, marijuana smoke and odor, prisoners with unaccounted for injuries, and staff antagonism toward detainees. *Id.* ¶¶ 21–29. Moore alleges that "[t]his unprecedented memorandum and [the corresponding] removal of 400 USMS detainees from the DC Jail should

have been treated as an indication of a four-alarm emergency regarding conditions in the DC Jail." *Id.* ¶ 30. The Complaint also summarizes the findings of a July 2021 D.C. Office of the Inspector General report that found deficiencies in the D.C. Jail's operations. *Id.* ¶¶ 31–36. "While this audit focused on use of force by staff," Moore explains that "security lapses lead to all manner of risk to residents." *Id.* ¶ 34. One of those lapses Moore highlights was a finding that "15% of the surveillance cameras in DOC did not work at all or did not work correctly." *Id.* ¶ 35.

The Complaint further alleges that the D.C. Jail and the Correctional Treatment Facility, another DOC facility, "have for years had excessively high levels of contraband weapons in circulation" and that since 2021, "stabbings within the DC Jail have only continued to increase." *Id.* ¶ 37. For instance, the Complaint cites a news report of an increase of stabbing attacks by "38.46 percent between 2022 and 2023," from 13 to 18 stabbings. *Id.* ¶¶ 37–38 (citing Jeff Levine, *D.C. Witness Exclusive: Increase in Stabbings Only Part of Inmate Safety Problem at DC Jail*, D.C. Witness, (July 25, 2024), https://dcwitness.org/d-c-witness-exclusive-increase-in-stabbings-only-part-of-inmatesafety-problem-at-dc-jail/ [https://perma.cc/8S6J-33BS]). The Complaint goes on to discuss a non-exhaustive list of 12 stabbing incidents that occurred at the D.C. Jail between 2008 and 2024. *Id.* ¶¶ 40–52.

In July 2025, the District removed this case to federal court. *See* Corrected Notice of Removal, ECF No. 2. The District then moved to partially dismiss Moore's Complaint, specifically his Fifth Amendment § 1983 claim, for failure to state a claim. Mem. P. & A. Supp. Def. Partial Mot. Dismiss ("MTD") at 1–2, ECF No. 10. The District's "motion does not seek dismissal" of his negligence claims. *Id.* at 1. The partial motion to dismiss is fully briefed and ready for this Court's consideration. *See* Pl.'s Opp'n, ECF No. 12; Def.'s Reply, ECF No. 13.

### III.  LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  But courts need not accept as true conclusory allegations or legal conclusions. *Id.* at 678, 681.

### IV.  ANALYSIS

Moore asserts that the District violated his Fifth Amendment rights by failing to protect him from being stabbed while he was a pretrial detainee in the D.C. Jail.  The Court concludes that his Complaint fails to state a Fifth Amendment violation because Moore fails to plausibly allege that he was detained under conditions posing a substantial risk of serious harm.  He alleges no facts that support that he was at a particular risk of being attacked, or that his attacker had a proclivity for violence.  Instead, Moore relies on general allegations of an unsafe jail.  But he fails to allege systemic security failures severe enough to support an inference that every detainee in the D.C. Jail was at a substantial risk of harm from being stabbed by a fellow detainee.  Having failed to plausibly allege that he was particularly at a substantial risk, or that every detainee was at a substantial risk, Moore has failed to state a Fifth Amendment due process violation.  Accordingly, the Court grants the District's partial motion to dismiss.

4

Section 1983 provides a private cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia" causes a deprivation of a constitutional right.  42 U.S.C. § 1983.  In *Monell*, the Supreme Court rejected a *respondeat superior* theory of municipal liability under § 1983, and held that "municipalities can be held liable for constitutional violations committed by their employees only if a plaintiff shows that the municipality is the 'moving force' behind the constitutional violation, meaning that an 'official municipal policy of some nature caused a constitutional tort." *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 389, 691, 694 (1978)).  The D.C. Circuit has articulated a two-step inquiry to determine "whether a plaintiff has stated a claim for municipal liability."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). "First, the court must determine whether the complaint states a claim for a predicate constitutional violation."  *Id.*  "Second, if so, then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation."  *Id.*

The Court's analysis does not proceed past this first step.  Moore asserts a Fifth Amendment violation based on the District's failure to protect him from his fellow detainee. Pl.'s Opp'n at 3–4.  The Supreme Court first confirmed an Eighth Amendment duty of prison officials to protect prisoners from violence by other prisoners in *Farmer v. Brennan*, 511 U.S. 825 (1994).  In doing so, however, the Supreme Court explained that not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  *Id.* at 834.  Rather, "[f]or a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a

substantial risk of serious harm" and that the prison official acted with "deliberate indifference" to inmate health or safety.  *Id.*

Whereas the Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, "pretrial detainees (unlike convicted prisoners) cannot be punished at all," *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015).  Rather, the Fifth Amendment's Due Process Clause is the source of a pretrial detainee's protection in the District of Columbia.  *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979); *Brogsdale v. Barry*, 926 F.2d 1184, 1187 (D.C. Cir. 1991); *Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (D.C. Cir. 2001).  Even so, because the rights of pretrial detainees are at least as great as those of convicted prisoners, courts apply the *Farmer* framework to determine whether a plaintiff has stated a plausible failure-to-protect claim.  *See, e.g.*, *Bah v. District of Columbia*, No. 23-cv-1248, 2024 WL 983329, at *3 (D.D.C. Mar. 7, 2024); *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 189 (D.D.C. 2009).  Here, the Court must determine whether Moore has pleaded (1) that he was at a substantial risk of serious harm and (2) that D.C. Jail officials showed deliberate indifference[1] to that risk.  *See Farmer*, 511 U.S. at 834.

On this inquiry too, the Court's analysis begins and ends on the first element: whether Moore has pleaded that he was at a substantial risk of serious harm.  *See Vandevender v. Sass*, 970 F.3d 972, 976 (8th Cir. 2020) (affirming dismissal of a complaint on the substantial risk

---

[1] The parties appear to agree that after the Supreme Court's decision in *Kingsley*, the deliberate indifference inquiry for pretrial detainees is based on an objective, not subjective, standard.  Pl.'s Opp'n at 3; Def.'s Reply at 3.  The Court agrees.  Of course, this would not convert the standard to mere negligence, as a higher level of culpability is still required to state a due process claim.  *Kinglsey*, 576 U.S. at 396; *accord* Pl.'s Opp'n at 4 ("A pretrial detainee like Mr. Moore need only show that a defendant 'knew or should have known that the jail conditions posed an excessive risk to their health and intentionally or recklessly failed to act.'" (quoting *Banks v. Booth*, 468 F. Supp. 3d 101, 111 (D.D.C. 2020)).

element without analyzing the deliberate indifference element).  The District argues that "Mr. Moore fails to plead any facts about himself or the perpetrator of this intentional violent act that could have put the correctional officers on notice that Mr. Moore was at risk."  MTD at 6. Moore responds that the D.C. Jail's conditions posed an "objectively unreasonable risk that he would be assaulted by another detainee with a contraband weapon."  Pl.'s Opp'n at 4.  But rather than contest whether he was particularly at risk, Moore argues that "courts in this District have held in failure-to-protect cases that risks of harm in carceral facilities caused by staff failures constitute an objectively unreasonable and unconstitutionally excessive risk to the health of the detainee population *at large*."  *Id.* at 6 (emphasis added).  Thus, he relies on a theory that the entire D.C. Jail population was at a substantial risk of serious harm on the day he was stabbed. *See id.* at 7 ("But when a risk is pervasive and dangerous to all residents, no such particularity is required.").  Based on the Complaint's factual allegations, the Court finds this claim implausible.

The Court is unaware of D.C. Circuit precedent defining what constitutes a "substantial risk of serious harm," and the parties have not identified any binding authority on this issue. Moreover, the Supreme Court did not address the issue in *Farmer*.  511 U.S. at 834 n.3.  So the Court looks to other Circuits.  "There exists no precise definition of those types of conditions of confinement that violate the first prong of the *Farmer* test by 'posing a substantial risk of serious harm.'"  *Grimsley v. MacKay*, 93 F.3d 676, 681 (10th Cir. 1996).  "[T]he first *Farmer* factor is not subject to a bright line test."  *Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019).  "As is often true, the determination of what is 'substantial' depends on the context of the inquiry."  *Id.* Courts must conduct an "objective analysis" to determine whether the risk "is not one that today's society chooses to tolerate."  *Banks v. Booth*, 468 F. Supp. 3d 101, 111 (D.D.C. 2020) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).  And in determining whether the

detainee was exposed to a substantial risk, courts must avoid "hindsight bias." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) ("The mere fact that an event takes place does not indicate how likely it was to occur."); *see also Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) ("To satisfy this prong, a plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that that serious harm might actually occur.").

As an initial matter, the Court agrees with the District that Moore does not identify any aspects of his stabbing to support that he was particularly at risk.[2]  "The only risk to Mr. Moore pled in this case is a general risk of inmate violence at the D.C. Jail."  MTD at 8.  For instance, the Complaint does not allege that Moore was particularly vulnerable to attack or had been previously threatened.  The Complaint does not allege that his attacker was known for violence or had previously attacked or threatened to attack anyone.  Though the Complaint notes members of the jail population had been accused of violent crimes and had "mental health disabilities," the Complaint does not allege that Moore's attacker fell into either category.  *See* Compl. ¶¶ 16–17.  Similarly, though the Complaint alleges that about one third of the population was under "keep separate" orders, the Complaint does not allege that such an order applied to Moore or his attacker.  *See id.* ¶ 39.  And though the Complaint alleges that 15% of DOC surveillance cameras were not working, it does not allege that the cameras in the shower area where he was stabbed were not working.  *See id.* ¶¶ 35–36.  The Complaint does not even allege that the shower area where he was attacked was a particularly common place for stabbings.  All this to say, the Complaint is devoid of any particularized risk to Moore of being stabbed that day.

---

[2] No one disputes that the injuries Moore suffered were sufficiently "serious," as "a beating suffered at the hands of a fellow detainee . . . clearly constitutes serious harm." *See Brown*, 398 F.3d at 910.

Though Moore argues that *Bah* and *Hardy v. District of Columbia*, No. 22-cv-2826 (D.D.C.), are "the two most relevant decisions" and that his allegations "are largely identical" to those cases, they are both easily distinguishable because they involved particularized risk. *See* Pl.'s Opp'n at 6, 8. In *Bah*, the District did not contest whether the plaintiff had been at a substantial risk of harm, so this element was not at issue. *Bah*, 2024 WL 983329, at *5. Even so, the court noted that "allegations bearing on th[e] Fifth Amendment failure-to-protect claim include[d]," in addition to "a general risk of inmate-on-inmate violence at the jail, the fact that the inmate who stabbed Bah had previously stabbed at least two other inmates, and the fact that Bah had gotten into an argument with that inmate earlier in the day in an area that should have been supervised." *Id.* at *5 n.7 (citations omitted). Likewise, in *Hardy*, the plaintiff alleged three separate attacks by the same inmate over a six-month period, despite a separation order. Hr'g Tr. at 4–5, *Hardy v. District of Columbia*, No 22-cv-2826 (D.D.C. July 11, 2024), ECF No. 21. Because the particular risk to the plaintiffs in *Bah* and *Hardy* meaningfully distinguishes those cases, the Court turns to Moore's theory that the D.C. Jail population in general was at a substantial risk of serious harm.

The Court agrees with Moore that a plaintiff need not necessarily "show a particularized risk to him by showing that he had been attacked or threatened by his attacker." *See* Pl.'s Opp'n at 10–11. To be sure, some courts appear to require a particularized risk. *See Thomas v. Dart*, 39 F.4th 835, 842–43 (7th Cir. 2022) ("[T]he risk must be somehow 'specific to a detainee, and not a mere general risk of violence.'" (quoting *Brown*, 398 F.3d at 909)). But others recognize that a generalized risk of inmate violence can support a failure-to-protect claim where "the plaintiff has pointed to specific features of a facility or its population rendering it particularly violent," such as "pervasive staffing and logistical issues rendering prison officials unable to

address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." *Marbury v. Warden*, 936 F.3d 1227, 1235 (11th Cir. 2019) (footnotes omitted). The Eighth Circuit, pulling from pre-*Farmer* Circuit precedent, has equated a "substantial risk" with a "pervasive risk of harm," which requires "much less than proof of a reign of violence and terror," but must "occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem."[3] *Vandevender*, 970 F.3d at 977 (quoting *Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir. 1991)). Regardless of the exact standard, in the context of a purely general risk to the entire detainee population, the risk must be "excessive" and so "grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Baker*, 326 F.3d at 1306; *Banks*, 468 F. Supp. 3d at 111 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

Here, Moore fails to identify a case in which allegations similar to his supported a generalized failure-to-protect claim. His reliance on *Banks* is misplaced for the simple reason that the generalized nature of the risk to inmates from the COVID-19 pandemic—caused by a highly contagious airborne virus—is more readily established than the risk from individual bad actors. *See Banks*, 468 F. Supp. 3d at 111–12. Moreover, in *Banks* the court granted a preliminary injunction after finding that the plaintiffs had established "that they experience a significantly higher rate of infection and risk of harm than the population at large," such that they

---

[3] This standard seems to conflate the first and second *Farmer* elements by determining whether a risk was substantial based on whether officials were aware of the problem, a factor more appropriately considered on the "deliberate indifference" prong.

had been "exposed to an unreasonable risk of damage to their health."[4] *Id.* at 112. Plaintiff does not make any similar allegation or argument comparing the rates or risks of stabbings. Thus, the Court is unable to speculate that the risk of any D.C. Jail detainee being stabbed in August 2024 was so excessive as to be objectively unreasonable. *See Thomas*, 39 F.4th at 843 (holding that the plaintiff could not "assert an appreciable risk of harm based solely on his placement in the Jail's general population because the 'general risks of violence in prison' confront virtually every detainee"). Rather, the District's argument that a generalized risk in these circumstances would require facts supporting that "violence is truly the norm" is well taken and consistent with the cases it cites. *See* Def.'s Reply at 6; *Marbury*, 936 F.3d at 1234 ("To establish deliberate indifference based on a generalized risk, the plaintiff must show 'that serious inmate-on-inmate violence was the norm or something close to it.'" (quoting *Purcell ex rel. Est. of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1322 (11th Cir. 2005)); *Purcell*, 400 F.3d at 1320 ("We accept that an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, but confinement in a prison where violence and terror reign is actionable." (citation modified)).

Moore's reliance on *Marsh* illustrates that his allegations are degrees removed from allegations sufficient to support an inference of a generalized substantial risk. *See* Pl.'s Opp'n at 5. In *Marsh* the plaintiff inmates alleged that "the locks on the doors to cells did not work, . . .[t]he structure of the Jail was so dilapidated that inmates could fashion weapons from pieces of the building," and that "no video or audio surveillance system was in place to check on

---

[4] This finding also came after the court noted that the defendants there made "little mention of unreasonable risk, focusing instead on deliberate indifference." *Banks*, 468 F. Supp. 3d at 111.

the inmates." *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc).  Given the degree of breakdown in basic jail functions, the Eleventh Circuit concluded that "conditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates." *See id.* at 1028.  But here, Moore has not alleged any similar wholesale breakdown in the system such that D.C. Jail officials had no ability to surveil or lockdown inmates who could access weapons by "cannibalizing parts of the decaying building." *See id.* at 1024.  Though a near 40% increase in stabbings between 2022 and 2023 is a serious cause for concern, the source for that statistic specifies that the increase was from 13 stabbings in 2022, to 18 stabbings in 2023.  *See* Compl. ¶ 38; Jeff Levine, *D.C. Witness Exclusive: Increase in Stabbings Only Part of Inmate Safety Problem at DC Jail*, D.C. Witness, (July 25, 2024), https://dcwitness.org/d-c-witness-exclusive-increase-in-stabbings-only-part-of-inmatesafety-problem-at-dc-jail/ [https://perma.cc/8S6J-33BS].  Any number of stabbings is concerning, but the Court does not find that number alone, without any context as to how many detainees were housed in the D.C. Jail at one time and over a year, demonstrates a sufficient frequency to constitute a pervasive risk.  *See Vandevender*, 970 F.3d at 977.

The other Eleventh Circuit case on which Moore relies is further afield.  *See* Pl.'s Opp'n at 5.  *Lane v. Philbin*, 835 F.3d 1302, 1307–08 (11th Cir. 2016), was not simply about generalized risk; in addition to the ready availability of materials to make weapons and ineffective supervision, the plaintiff also alleged that he was part of the 10% minority of the inmate population that was not gang-affiliated who were frequently robbed and stabbed.  *Id.* at 1307.  In contrast, Moore alleges no such status that would put him at greater risk of being targeted for violent attacks.

12

In sum, Moore's allegations do not rise to the level of plausibly stating a claim that every inmate in the D.C. jail was at a substantial risk of being stabbed. And he pleads no facts indicating that he was at a particular risk of being stabbed. For these reasons, the Court concludes he has failed to plead the first element of his predicate Fifth Amendment due process claim, and accordingly grants the District's partial motion to dismiss this claim without discussing the other elements.

*        *        *

When a district court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction." 28 U.S.C. § 1367(c)(3). "[A]lthough supplemental jurisdiction persists, the district court need not exercise it: Instead, the court may (and indeed, ordinarily should) kick the case to state court." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025). "In the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine will point toward declining to exercise jurisdiction over the remaining state-law claims." *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (citation modified). As courts have noted, "no unfairness attaches" to the decision to decline supplemental jurisdiction because 28 U.S.C. § 1367(d) tolls the statute of limitations while the claim is pending and for at least 30 days after it is dismissed. *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 400 (D.D.C. 2016). In their briefs, the parties did not address whether this Court should exercise supplemental jurisdiction under 28 U.S.C. § 1367 if it dismissed Moore's constitutional claim. As a result, the Court will order that the parties provide their position on this issue on or before March 23, 2026.

## V.  CONCLUSION

For the foregoing reasons, Defendant District of Columbia's Partial Motion to Dismiss (ECF No. 10) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 9, 2026                                    RUDOLPH CONTRERAS
                                                         United States District Judge